Peter B. Janci, OSB No. 074249
peter@crewjanci.com
Kendall M. H. Spinella, OSB No. 214446
kendall@crewjanci.com
CREW JANCI LLP
9755 SW Barnes Rd Suite 430,
Portland, OR 97225
Tel: (503) 306-0224
*Of Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **JULIE DOE,** an individual proceeding under a pseudonym,<br><br>              Plaintiff,<br><br>     v.<br><br>**CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,** a Utah corporation sole; **CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,** a Utah corporation sole; and, **THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS**, a Utah corporation sole,<br>              Defendants. | CASE NO. _____<br><br>**COMPLAINT**<br>(Negligence)<br><br>**JURY TRIAL DEMANDED** |

## **COMPLAINT**

COMES NOW the Plaintiff by and through her attorneys and hereby states and alleges as follows:

Page 1 – **COMPLAINT**

## INTRODUCTION

1.

This case involves abuse of a minor allowed, permitted or encouraged by the Church of Jesus Christ of Latter-day Saints (the "LDS Church") and its agents as set out below. The victim (Plaintiff) and the abusers were members of or participants in the LDS Church with whom the LDS Church had special relationships. Before many of the acts of abuse suffered by Plaintiff, the LDS Church learned through its agents that Plaintiff was being abused and that the circumstances indicated that the abuse would continue. By failing to respond in any way to repeated indications of sexual abuse of the minor Plaintiff, the LDS Church knowingly allowed and permitted the victim to be subjected to near-daily invasive sexual abuse and rape, as well as psychological abuse and mental cruelty which extended for months.

## PARTIES

2.

Plaintiff Julie Doe is an adult woman, a natural individual domiciled in Pierce County, Washington, and a citizen residing in Pierce County, Washington. Plaintiff was born in August of 2000. Plaintiff is a victim of severe and repeated child sexual abuse, psychological abuse, and mental cruelty and is proceeding under a pseudonym to protect her privacy based on concerns about humiliation and reprisal. Plaintiff's identity has been shared with counsel for Defendants to facilitate their investigation and defense of this matter. Plaintiff's need for anonymity outweighs any public interest in knowing Plaintiff's identity.

3.

At all time relevant to this complaint, Defendant Corporation of The Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints ("Corporation of the Presiding Bishop"), was a corporation sole incorporated in the State of Utah, a citizen of the State of Utah, and had its principal place of business in the State of Utah. At all time relevant to this complaint, Defendant Corporation of The President of The Church of Jesus Christ of Latter-Day Saints ("Corporation of The President") was a corporation sole incorporated in the State of Utah, a citizen of the State of Utah, and had its principal place of business is the State of Utah. The Church of Jesus Christ of Latter-day Saints is a Utah corporation sole, with its principal place of business in Salt Lake City Utah, and, on information and belief, is a successor an interest to the Corporation of the Presiding Bishop and Corporation of the President. Defendant Corporation of The Presiding Bishop, Defendant Corporation of The President, and The Church of Jesus Christ of Latter-day Saints will hereinafter be referred to collectively as "LDS Church", "LDS Church Defendants," or "Defendants."

## **JURISDICTION**

4.

Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. As set out in paragraphs 2 through 4, there is a complete diversity of citizenship among the parties. The amount in controversy, exclusive of interest in costs, exceeds the sum or value of $75,000.00.

## **VENUE**

5.

Venue is proper in the United States District Court for the District of Oregon, Eugene Division, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and/or

Page 3 – **COMPLAINT**

omissions giving rise to the claims alleged herein occurred in Linn County, Oregon.

## FACTS

### The LDS Church (or "Mormon Church")

6.

The Church of Jesus Christ of Latter-day Saints (the "LDS Church" or "Mormon Church") is a hierarchically structured religious institution. At the top, the President of the LDS church is the "Divine Prophet, Seer and Revelator" and wields the highest level of authority within the LDS Church. The LDS President  has the authority to appoint and remove anyone in the LDS church, including all members of local level organizations known as Wards and Stakes at will. He delegates responsibility through various corporations, unincorporated associations, and agents. The power and authority of the LDS President includes: the appointment of LDS Church officials; the promulgation of LDS Church policy and procedures; the management of LDS Church property and assets; the conduct of Church-controlled corporations; the discipline of LDS Church members, participants and leaders; and furthering the overall welfare of the LDS Church, its members, and participants. The President's authority in the LDS Church's affairs is absolute. He has the authority to dictate changes in the LDS Church's policy, discipline, ecclesiastical doctrine, or anything else he so chooses. The acts of the President, in his capacity as head of the LDS Church, are the acts of Defendant Corporations.

7.

At all time relevant to this complaint, The Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints and the Corporation of the President of the Church of Jesus Christ of Latter-day Saints administer the LDS Church's multilevel structure. The hierarchical structure is strict. The structure of the LDS Church pertinent to this case is as

Page 4 – **COMPLAINT**

follows: at the local level are "wards" (or in similar areas "branches") (hereinafter "wards"). Wards consist of a geographical area administered by a bishop and two counselors. Together they comprise the governing "bishopric" and have comprehensive pastoral and administrative responsibility of the ward, including but not limited to primary responsibility for developmental programs involving the youth of the ward. Bishops are also obligated to oversee youth in the ward and youth activities. Bishops are also authorized to initiate serious Church disciplinary proceedings, including excommunication. The Bishop's approval is necessary before a member of the ward can be baptized or ordained a priest.

8.

A cluster of wards is grouped into a "stake," which is administered by a "Stake President," and a Stake High Council. A Stake President is the presiding high priest of the stake and must oversee the welfare matters and records of the stake. A Stake High Council is a group of twelve men called to help oversee the work of the Stake. They are deemed High Councilors, who work directly under the direction of the stake president and help train and supervise Stake personnel or programs. The High Council also convenes as a disciplinary council in cases when serious misconduct or breach of church rules or teachings may affect someone's church membership.

9.

Stakes are grouped into areas, which are administered by an Area President. All bishops, stake presidents, high councilors, and area presidents are agents of, exercise authority delegated by, and report to the LDS Church and the LDS President. The Wards, Stakes, and Areas of the LDS Church are instruments of Defendant Corporations and are not separate corporate entities.

Page 5 – **COMPLAINT**

10.

Adherents of the faith who have been baptized into the LDS Church are known as members. Defendants have the power to limit or restrict the capacity in which any member serves or participates in the LDS Church and may place such conditions on a member as the LDS Church determines may be in its interests and the interests of its members, and prospective converts.

11.

Members of the LDS Church are instructed that the Bishops and Stake Presidents are "called by God" to their office, that Bishops and Stake Presidents are specially endowed with wisdom and understanding, and that the decisions of Bishops and Stake Presidents within the scope of their authority are guided by divine revelation. Members are encouraged to seek and comply with the advice of their Bishops and Stake Presidents on matters involving important decisions in their daily lives.

12.

Within the structure and doctrine of the LDS Church, member families and their homes are the central and most "basic unit" of the LDS Church. The LDS Church instructs that "[t]he work of salvation and exaltation is centered in the home and supported by the Church." Occurrences within members' families and activities within members' homes are squarely within the purview of the LDS Church. As evidence of such, the LDS Church has published a "Family Guidebook" for its members. The leaders at every level, including stake presidents and bishops, are responsible for strengthening families, encouraging them to learn and pray within the home, and understanding their member's home circumstances. The LDS Church's role in members' homes includes a priesthood program called "Home Teaching," in which it

enlists agent-members of its priesthood to "visit the house of each member, exhorting them to pray vocally and in secret and attend to all family duties." The LDS Church instructs Home Teacher that their duties include being "aware of the attitudes, the activities and interests, the problems, the employment, the health, the happiness, the plans and purposes, the physical, temporal, and spiritual needs and circumstances of everyone—of every child, every youth, and every adult in the homes and families who have been placed in our trust and care as a bearer of the priesthood, and as a representative of the bishop." The doctrines of the LDS Church are clear that the Church is centered in the home and its leaders have a responsibility to care for and support the families of its members, including with problems in the home.

### The LDS Church's Extensive Knowledge of the Problem of Child Abuse

13.

Since at least the 1990's, LDS Church Defendants have been on notice of sustained and systemic problems of sexual abuse of children entrusted to its care. For example, within the last handful of years, thousands of claimants have alleged that they were sexually abused by LDS Church officials in LDS Church-run scouting troops. Over the same time period, many others have alleged abuse that occurred within the context of the LDS Church, but outside of the scouting context, including within religious services and programing and within the homes of LDS church members. The LDS Church has documented this knowledge, including in individual "Red Flags," "annotations," or other documents within or related to perpetrators' LDS church membership files, in risk management files, in church discipline documents, in connection with the LDS Church Abuse Hotline ("Abuse Help Line" or "Hotline") and elsewhere. This documentation comprised a body of specialized knowledge known to LDS Defendants regarding

Page 7 – **COMPLAINT**

the ongoing problem of sexual abuse of LDS youth. On information and belief from this body of

specialized, Defendants knew: (a) the recidivistic nature of child sexual abusers; (b) the methods

by which predatory child molesters accomplish their abuse of children (including how abusers

groom and isolate victims to accomplish and continue abuse); (c) the common indications that

abuse was occurring; and (d) the common escalation of abuse when intervention is not made.

Based on this knowledge, on information and belief, Defendant was aware that children in

special relationship with the LDS Church were in fact being sexually abused and knew that

further sexual abuse would occur if agents of LDS Church Defendants did not properly respond

to this known danger.

14.

LDS Church Defendants also have a history and pattern of failing to report and otherwise

properly respond to child sexual abuse perpetrated by its members or reported to its leadership.

This pattern has included, among other things, a policy or practice by LDS Church Defendants

of handling information about suspected child sexual abuse internally rather than involving

outside civil authorities. One of the LDS Church's internal mechanisms for responding to

information about suspected child sexual abuse has been through an internal, church-run abuse

hotline to instruct and advise church leaders who received information indicating that abuse is

occurring. On information and belief, one of LDS Church policies with regard to responding to

suspected child sexual abuse has been to instruct that its agents receiving reports of abuse should

"never advise a priesthood leader to report abuse," but should instead refer to such individuals to

the LDS Church's attorneys for instruction. On information and belief, LDS Church has also

maintained a policy requiring regular destruction of documentation created by its agents staffing

its abuse hotline.

Page 8 – **COMPLAINT**

**Plaintiff Julie Doe**

15.

In approximately June of 2013, Julie Doe was placed in a foster care home with Jennifer Ford and Craig Ford, a married couple residing in Ridgefield, Washington with their two biological daughters. As a child in the foster care system, Julie Doe was extremely vulnerable. On information and belief, LDS Church Defendants knew that Julie Doe was placed in foster care with Jennifer Ford and Craig Ford and therefore knew that Julie Doe was particularly vulnerable. In 2014, the Fords adopted Julie Doe and, in 2015, they adopted from foster care another minor girl referred to herein as "Sheila Doe" (a pseudonym for a known victim of child sexual abuse not a party to this action).

16.

In 2015, the Ford family regularly attended an LDS Church ward in a stake near Ridgefield, Washington. There, Craig Ford regularly participated in Sacrament and Julie Doe participated in church youth activities, including serving as a counselor in a young women's group.

17.

Around the end of December 2015, Craig Ford, then 31 years old, began sexually abusing Julie Doe when she was 15 years old. After the initial assault, Craig Ford continued his abuse of Julie Doe.

18.

Around late March or early April of 2016, Sheila Doe came into possession of more than a dozen letters containing sexual and romantic messages addressed to Julie Doe. Sheila Doe showed the letters to their adoptive mother Jennifer Ford (Craig Ford's wife). After reviewing the letters,

Page 9 – **COMPLAINT**

Jennifer Ford recognized the handwriting as that of Craig Ford and confronted him about the sexual and romantic messages. Craig Ford admitted to writing the letters to Julie Doe. Based on the content of the letters Jennifer Ford concluded that Craig Ford was engaged in an inappropriate sexual relationship with the Plaintiff. This confrontation resulted in an argument that caused Sheila Doe to call the police. Clark County Sheriff's Office responded to the call and filed a report. However, during this visit, Jennifer Ford did not disclose the sexual abuse of Plaintiff by Craig Ford to police. Jennifer Ford kept one or more of these letters in her possession after this confrontation.

19.

About a week or two later, in early April of 2016, all four children (including Plaintiff) were sent by Jennifer and Craig Ford to Montana to stay with relatives. During this time, Jennifer Ford searched Julie Doe's room and found a sex toy. Jennifer Ford confronted Craig Ford who admitted he bought the sex toy and gave it to Julie Doe.

20.

While the children were in Montana, Jennifer Ford reported Craig Ford's misconduct to an LDS Bishop and Stake President, Wade Pickett (hereinafter "Pickett", "Bishop Pickett" or "Stake President Pickett"). Jennifer Ford showed Stake President Pickett the letter that Craig Ford had handwritten to Julie Doe, which Stake President Pickett read. That letter included statements calling Julie Doe "sexy", telling her that he "enjoyed holding [Julie Doe] in his arms," referring to "all the things [he] want[ed] to do to [her]" and encouraging Julie Doe to imagine how Craig Ford's "arms wrap around [Julie Doe] and feel how our bodies just melt together"; and closing with Craig Ford expressing to Julie Doe: "I love you and want to be with you forever." During this meeting, in addition to sharing the letter with Stake President Pickett, Jennifer Ford also expressed

Page 10 – **COMPLAINT**

that to Pickett that she suspected Craig Ford was having a sexual relationship with Julie Doe and, on information and belief, disclosed about and/or showed Pickett the sex toy Craig Ford bought for plaintiff.

21.

Jennifer Ford went to Stake President Pickett with the information set out in paragraphs 18 through 20, above, at least in part, because of his role as a leader in and agent of the LDS Church (a Bishop and/or Stake President) and with the understanding that Stake President Pickett would know the appropriate course of action to take to respond to the suspected child sexual abuse of Julie Doe by Craig Ford. The information shared by Jennifer Ford with Pickett was material to Pickett's agency duties to the LDS Church. The information learned by Pickett regarding Craig Ford's abuse of Julie Doe was imputed to Defendants.

22.

Despite this information, Pickett did not take action to report the abuse to civil authorities, investigate, intervene, or otherwise prevent or protect against any further child sexual abuse of Julie Doe by Craig Ford. On information and belief, Pickett also did not advise Jennifer Ford to report the abuse. On information and belief, Pickett expressly or implicitly attributed responsibility (in whole or part) to Plaintiff for the sexual abuse.

23.

Within weeks of the initial report by Jennifer Ford to Stake President Pickett, Pickett learned that Craig Ford picked up Julie Doe from Montana and took her alone to Albany, Oregon where he remained with her. Pickett also learned at this time that Craig Ford and Jennifer Ford's marriage was estranged and the two were separated. Still, the LDS Church took no action to report, investigate, intervene, or otherwise prevent or protect against further abuse of Julie Doe

by Craig Ford.

24.

Upon arriving in Albany, Oregon, the Defendants, already aware from previous reports and evidence that Craig Ford was sexually abusing Julie Doe, learned through its agents, that Craig Ford was cohabitating alone in an apartment with Julie Doe. Moreover, both Julie Doe and Craig Ford participated in church services and programming provided by the LDS Church Defendants in the Albany area. Agents of the Defendants also visited the apartment where Craig Ford was residing with Julie Doe. Through these interactions with and observations of Craig Ford and Julie Doe, Defendants learned through their agents that:

- Julie Doe expressed to LDS Church leaders (agents of Defendants) that she had a difficult secret that she wanted to share with trusted church leaders but was having trouble bringing herself to disclose;

- Craig Ford openly displayed risqué images of females and made references likening those images to Julie Doe;

- Craig Ford engaged in unusual interactions with Julie Doe that were not like those of a caretaker and child; and

- LDS Church leaders (including the Albany Ward Bishop) were concerned that something was amiss, within the household.

On information and belief, based on this knowledge together with the earlier report to Stake President Pickett, the LDS Church was aware that Craig Ford was continuing his sexual abuse of Julie Doe.

25.

Starting in April 2016 and for months thereafter, Craig Ford proceeded to live alone

Page 12 – **COMPLAINT**

with Julie Doe in the Albany Area. Craig Ford sexually abused Julie Doe during this period on an almost daily basis, including:

    a.  Taking Julie Doe's clothes off;

    b.  Groping Julie Doe's breasts and genitals;

    c.  Directing Julie Doe to perform oral copulation on Craig Ford;

    d.  Subjecting Julie Doe to penile-vaginal penetration; and

    e.  Subjecting Julie Doe to penile-anal penetration.

26.

On information and belief, after LDS Church Defendants learned that Craig Ford was sexually abusing Julie Doe, LDS Church Defendants expressly or implicitly attributed responsibility to Julie Doe (a minor), at least in part, for the sexual abuse she had suffered. On information and belief, by failing to properly intervene to stop the abuse or lend support to Julie Doe and while attributing responsibility to Julie Doe (at least in part) for the abuse, the LDS Church Defendants also knowingly allowed, permitted, and encouraged abuse of Julie Doe by Jennifer Ford in the form of mental cruelty to a child, including Jennifer Ford:

- verbally harassing Plaintiff;

- expressly blaming Plaintiff for the sexual abuse by Craig Ford;

- repeatedly calling Plaintiff a "homewrecker";

- repeatedly calling Plaintiff a "slut", a "whore" and similar slurs;

- exclaiming to Plaintiff that she had caused injury to Craig Ford's other children;

- threatening to tell others (including Plaintiff's biological mother) that Plaintiff had sexual contact with Craig Ford; and

- encouraging Plaintiff to complete suicide.

Page 13 – **COMPLAINT**

27.

In Fall of 2016, while Craig Ford was living with and sexually abusing Julie Doe in Albany, Oregon, Craig Ford's youngest daughter gave a note with her classmate that read: "I wish my teacher knew that we think my dad had sex with sister[;] want to talk to you." The classmate brought the note home to her mother, who immediately contacted the Vancouver Police Department. The Vancouver Police Department began an investigation in conjunction with the Washington Department of Social and Health Services ("DSHS") Children's Administration into the allegations contained in the note. During these investigations, Stake President Pickett was contacted and interviewed by DSHS. During that interview, Stake President Pickett acknowledged that he had been notified by Jennifer Ford that Craig Ford was sexually abusing Plaintiff, including that Jennifer Ford had shown him one or more incriminating letters that Craig Ford had written to Julie Doe which corroborated Ford's abuse of Julie Doe.

28.

In 2018, Craig Ford was convicted on charges of incest and child molestation for the abuse of Sheila Doe in Superior Court of Washington, Clark County, Case No. 18-1-00824-7. In 2021, Craig Ford was convicted on charges of incest and rape for the abuse of Julie Doe in Circuit Court of Oregon, Linn County, Case No. 20CR44346. In 2022, Craig Ford was convicted on charges of incest and rape for the abuse of Julie Doe in Superior Court of Washington, Clark County, Case No. 20-1-01665-06. Craig Ford is currently serving a prison sentence.

29.

As a direct result of the sexual abuse, rape, and mental cruelty inflicted upon her, Plaintiff

Julie Doe has suffered and will continue to suffer severe debilitating mental and emotional injury, including but not limited to pain and suffering, emotional trauma, disgrace, humiliation, shame, guilt, anxiety, stress, low self-esteem, depression, suicidal ideation, social isolation, embarrassment, avoidance, denial, anger, distrust of authority, nightmares, panic attacks, insomnia, and distrust of others. These injuries have caused and will continue to cause Plaintiff non-economic damages in the approximate amount of $20,000,000.00, the exact amount to be proven at trial.

30.

As a direct result of the sexual abuse, rape, and mental cruelty inflicted upon her, Plaintiff has incurred and will continue to incur lost earning capacity and costs for psychotherapy, psychological evaluations, psychiatric care, and/or other similar medical treatment. These injuries have caused and will continue to cause Plaintiff economic damages in the approximate amount of $5,000,000.00, the exact amount to be proven at trial.

31.

Plaintiff's claims are timely pursuant to ORS 12.117.

## FIRST CLAIM FOR RELIEF

### NEGLIGENCE

32.

Plaintiff realleges and incorporates herein paragraphs 1 through 31.

33.

Defendants invited Plaintiff and all other members of the public to enter a special

relationship with the LDS Church, in part inviting Plaintiff to entrust herself into the care of the

Church. Plaintiff did in fact enter into a special relationship with Defendants as a church member

and/or participant in church services and programming. As a result of this special relationship,

Defendants owed Plaintiff, a minor child, a special duty of care in addition to a duty of ordinary

care to protect her from harm. Additionally, as a result of this special relationship, Plaintiff was a

member of a class of individuals to be protected by proper warnings, interventions, reporting,

child abuse prevention policies, trainings, education, and procedures regarding responding to

known dangers of child sexual abuse. Such warnings, interventions, reporting, policies, trainings,

education, and procedures would have protected Plaintiff from sexual abuse she suffered.

34.

Defendants, by and through their agents, knew of Craig Ford's dangerous and abusive

propensities, including towards Plaintiff specifically. Based on both its historical knowledge of

other incidents of child sexual abuse and the specific knowledge it had about Craig Ford, it was

foreseeable that if Defendants did not adequately respond to the danger Ford posed toward

Plaintiff, Plaintiff (a child in a special relationship with Defendants) would be sexually abused

by Craig Ford.

35.

Prior to the last incident of sexual abuse that Plaintiff suffered, Defendants knew that

Craig Ford posed a danger of sexually abusing Plaintiff. On information and belief, Defendants

knew that:

      a.  Plaintiff's adoptive mother, Jennifer Ford, reported that Craig Ford had a sexual

           relationship with Plaintiff;

      b.  Craig Ford had written sexually suggestive letters to Plaintiff;

c.   Craig Ford had purchased and provided a sex toy to Plaintiff;

d.   Plaintiff did not come home with the three other children from Montana;

e.   Craig Ford was not living in the family home in Ridgefield, but instead had separated from his wife and was living alone with Plaintiff near Albany, Oregon;

f.   Julie Doe expressed to LDS Church leaders (agents of Defendants) that she had a difficult secret that she wanted to share with trusted church leaders but was having trouble bringing herself to disclose;

g.   LDS Church leaders (agents of Defendants) observed in the apartment that Craig Ford openly displayed risqué images of females and made references likening those images to Julie Doe;

h.   LDS Church leaders (agents of Defendants) observed unusual interactions between Craig Ford and Julie Doe that were not like those of a caretaker and child; and,

i.   LDS Church leaders (including the Albany Ward Bishop) were concerned that something was unusual, amiss, or weird in the household.

On information and belief, taking these observations and information together, LDS Church knew or reasonably should have known through its agents that Craig Ford had sexually abused Plaintiff and posed a danger of future sexual abuse of Julie Doe.

36.

On information and belief, prior to the last incident of child abuse in the form of mental injury or mental cruelty to Plaintiff inflicted by Jennifer Ford, Defendants knew or reasonably should have known that Jennifer Ford posed a danger of child abuse to Plaintiff. On information

Page 17 – **COMPLAINT**

and belief, Defendants knew that:

    a.  Jennifer blamed Plaintiff for the sexual abuse that Craig Ford inflicted upon her;

    b.  Jennifer had not contacted civil authorities to report the abuse of plaintiff by Craig Ford;

    c.  Jennifer viewed Plaintiff as a "slut," "whore," and "homewrecker;"; and

    d.  Jennifer posed a danger of inflicting upon intended to inflict mental injury upon Plaintiff for what Jennifer perceived as Plaintiff's role in causing the child sexual abuse inflicted by Craig Ford

37.

Despite the knowledge set forth in paragraphs 1 through 36 above, Defendants breached its special duty of care to the minor Plaintiff by:

    a.  Failing to effectively train church leaders (including Bishops, Stake Presidents and others) in how to properly respond to suspected child sexual abuse;

    b.  Failing to educate Plaintiff and other LDS youth about the dangers of child sexual abuse (including that it is not the victim's fault) and that such abuse will continue if the perpetrator maintains access to the victim;

    c.  Failing to investigate reports of abuse of Plaintiff by Craig Ford;

    d.  Failing to disclose to or concealing from law enforcement and other civil authorities' information that indicated that Plaintiff was sexually abused by Craig Ford;

    e.  Failing to disclose to or concealing from Plaintiff, law enforcement, or other civil authorities that Craig Ford posed a danger of further sexual abuse towards Plaintiff;

f.   Failing to offer support or services to Plaintiff to ameliorate the effects of the abuse by Craig Ford;

g.   Failing to otherwise enforce LDS Church's own stated policies and procedures for responding to suspected child sexual abuse; and

h.   Otherwise failing to reasonably respond to suspected child sexual abuse of minor church member or participant.

Through these acts and omission, Defendants allowed, permitted and/or encouraged Plaintiff to continue to be endangered and abused by Craig Ford and Jennifer Ford and created the circumstance where Plaintiff was less likely to receive care, intervention, and/or treatment, thus exacerbating the harm done to Plaintiff.

38.

Defendants' negligence, as detailed in paragraph 32 through 37 above, was unreasonable in light of the known threat posed to Plaintiff by Craig Ford and Jennifer Ford. In its negligence, Defendants knowingly allowed, permitted or encouraged child abuse pursuant to ORS 12.117. These acts and omissions were a direct and foreseeable cause of Plaintiff's injuries and the subsequent damages suffered from the abuse committed by Craig Ford and Jennifer Ford. Any or all of Defendants' acts and omissions described above caused some or all of Plaintiff's abuse and damages.

39.

As a result of the aforementioned negligence, Plaintiff suffered the sexual abuse alleged at paragraphs 25 and 26 and the resulting damages alleged at paragraphs 29 through 30.

Page 19 – **COMPLAINT**

40.

In light of Defendants' knowledge of the danger posed by Craig Ford and Jennifer Ford, Defendants' actions and omissions were undertaken with reckless and outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety, and welfare of Plaintiff. Plaintiff is therefore entitled to punitive damages against Defendants in an amount to be determined by a jury.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

Page 20 – **COMPLAINT**

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1. Non-economic damage for Plaintiff in the amount of $20,000,000.00, the exact amount to be determined by the jury at the time of trial;

2. Economic damage for Plaintiff in the amount of $5,000,000.00, the exact amount to be determined by the jury at the time of trial;

3. Punitive damages against Defendants for an amount to be determined by the jury at trial;

4. Plaintiff's costs and disbursements incurred; and,

5. For any other relief this Court deems just and equitable.


DATED this 10th day of February 2025.



_____

Peter B. Janci, OSB No. 074249
peter@crewjanci.com
Kendall M. H. Spinella, OSB No. 214446
kendall@crewjanci.com
CREW JANCI LLP
9755 SW Barnes Road., Ste. 430
Portland, OR 97225
Tel: (503) 306-0224

*Of Attorneys for Plaintiff*



Page 21 – **COMPLAINT**