IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

JULIE DOE,
*an individual proceeding under a pseudonym*

Plaintiff,

v.

CORPORTATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, *a Utah corporation*; CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, *a Utah corporation*; CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, *a Utah corporation,*

Defendants.

Case No. 6:25-cv-00222-MC

**OPINION AND ORDER**

---

MCSHANE, Judge:

Plaintiff Doe is a survivor of sexual abuse perpetrated by her father. The abuse, which spanned several years, occurred while Plaintiff and her family were members of The Church of Jesus Christ of Latter-day Saints. In an Amended Complaint, Plaintiff now brings four theories of negligence against Defendants, alleging they failed to meet their duties of care in response to learning of her intra-family abuse. Plaintiff's Motion for Leave to File an Amended Complaint, ECF No. 60, is GRANTED. Defendants now move for Judgement on the Pleadings. Because

Defendants did not have or violate any duties owed to Plaintiff, Defendants' Motion for Judgment on the Pleadings, ECF No. 56, is GRANTED.

## BACKGROUND[1]

In 2013, Plaintiff Julie Doe was placed in a foster care home with Jennifer and Craig Ford. Proposed First Amended Complaint ("PFAC") 2, ECF No. 60-1. The Fords adopted Plaintiff in 2014 and a second minor girl, "Sheila Doe," in 2015.

Plaintiff was baptized and confirmed within The Church of Jesus Christ of Latter-Day Saints (the "LDS Church") in October of 2014. PFAC 11. The next year, Plaintiff and the Ford family started attending an LDS Church ward in Ridgefield, Washington. PFAC 11. Craig Ford became a Church "Elder." PFAC 11. And Plaintiff regularly participated in Church activities. PFAC 11.

In December 2015, Craig Ford started sexually abusing the then 15-year-old Plaintiff. PFAC 12. In early 2016, Jennifer Ford "began to suspect that Craig Ford was sexually abusing Plaintiff" when she found intimate text messages between the two. PFAC 12. Jennifer Ford then discovered more than a dozen sexual and romantic letters between Plaintiff and Craig Ford. PFAC 12. Jennifer Ford confronted Craig Ford about the letters; he admitted to authoring them. PFAC 12. Jennifer Ford found a "sex toy and lubricant" in Plaintiff's room, which Craig Ford admitted to purchasing for Plaintiff. PFAC 13.

---

[1] After Defendants filed their Motion for Judgment on the Pleadings, Plaintiff filed a Corrected Motion for Leave to File Amended Complaint. ECF No. 60. District courts have significant discretion when considering leave to amend and should grant leave "when justice so requires." *DCD Progs., Ltd. v. Leighton,* 833 F.2d 183, 185–186 (9th Cir. 1987); Fed. R. Civ. P. 15(a)(2). Leave to amend should be given absent a strong showing of prejudice, undue delay, bad faith, futility, or where a previous amendment failed to cure the deficiencies. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Because Plaintiff did not unduly delay her motion, and the Proposed First Amended Complaint ("PFAC") does not prejudice Defendants, Plaintiff's Motion for Leave to File Amended Complaint, ECF No. 60, is GRANTED. This Order sources Plaintiff's allegations from her PFAC.

In April 2016, Jennifer Ford "reported Craig Ford's misconduct" to LDS Stake President Wade Pickett. PFAC 13. She showed Stake President Pickett one of the letters Craig Ford wrote to Plaintiff. PFAC 13. Moreover, Jennifer Ford "expressed to Pickett that she suspected Craig Ford was having a sexual relationship" with Plaintiff. PFAC 13. In response, Stake President Pickett "did not take action to report the abuse to civil authorities, investigate, intervene, convene a disciplinary council, or otherwise prevent or protect against any further child abuse of [Plaintiff] by Craig Ford." PFAC 14. He "did not take action to help, support, offer services to, counsel or warn Plaintiff of the long-term negative effects of the sexual abuse." PFAC 14. Finally, on information and belief, he "discouraged Jennifer Ford from reporting the abuse to civil authorities, alleging that she lacked sufficient proof[.]" PFAC.[2]

Also in April 2016, Craig Ford relocated to Albany, Oregon; he only moved with Plaintiff. PFAC 14. He continued to regularly abuse her. PFAC 14. Around this time, Stake President Pickett learned that "Craig Ford and Jennifer Ford's marriage was estranged, the two separated, and that [Plaintiff] was living alone with Craig Ford in Oregon." PFAC 14. Once again, the "LDS Church agents chose to ignore this information and chose not to" take action in response. PFAC 14. Craig Ford continued to abuse Plaintiff in Albany from April 2016 to September 2016. PFAC 14.

In Fall of 2016, Craig Ford's youngest daughter in Vancouver, Washington wrote a note to her classmate exposing his sexual abuse of Plaintiff. PFAC 15. The note led to the Vancouver Police Department investigating Craig Ford. PFAC 15. During the investigation, the Washington Department of Social and Health Services interviewed Stake President Pickett, and he acknowledged knowing about Craig Ford abusing Plaintiff. PFAC 15. On December 6, local LDS Church leaders in Washington alerted the LDS Church headquarters in Salt Lake City, Utah about

[2] In her original Complaint, Plaintiff alleged Stake President Picket "did not advise Jennifer Ford to report the abuse." Compl. 11, at ECF 1.

Jennifer Ford's report about the abuse. PFAC 16. The LDS Church "documented that the sexual abuse was allegedly 'consensual relations.'" PFAC 16. The LDS Church again "chose not to report, investigate, intervene, convene a disciplinary council, or otherwise prevent or protect against further abuse of [Plaintiff] by Craig Ford." PFAC 16. However, the LDS Church created an "annotation on Craig Ford's church membership records" that he "had been involved in 'Child Abuse or Incest.'" PFAC 16.

In February 2017, "an LDS Church leader took initiative to alert Bishop Nathan Hess" that Plaintiff was living alone with Craig Ford in Albany. PFAC 16. Bishop Daniel White, a local LDS Church leader in Albany, was also informed about Plaintiff's living situation and "about the history of allegations of sexual abuse of Plaintiff by Craig Ford." PFAC 17. After learning this information, neither Bishop White "nor any other LDS Church agent" took action. PFAC 17. Plaintiff continued to participate in LDS Church services and programming while living in Albany, often without her parents or guardians. PFAC 17. Craig Ford continued to sexually abuse Plaintiff in Albany. Plaintiff "misunderstood that Craig Ford's sexual contact with her was a sign of affection" and "mistakenly believed their sexual relationship was one in which she was a willing participant." PFAC 20.

In 2018, Craig Ford was convicted on charges of incest and child molestation for the abuse of Sheila Doe, Plaintiff's adoptive sister. PFAC 22. In 2021, Craig Ford was also convicted in Oregon on charges of incest and rape for the abuse of Plaintiff. PFAC 22. He was convicted in Washington in 2022—on the similar charges—for the abuse of Plaintiff. PFAC 22. Craig Ford is currently serving his prison sentence. PFAC 22.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure ("Rule") 12(c) permits a motion for judgment on the

pleadings. "[J]udgment on the pleadings is properly granted when, 'taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law.'" *Gregg v. Haw., Dep't of Publ. Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (quoting *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998)).

A Rule 12(c) motion for judgment on the pleadings is "functionally identical" to a Rule 12(b)(6) motion to dismiss, and therefore "the same standard of review applies[.]" *Gregg*, 870 F.3d at 887 (quoting *Cafasso v. Gen Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011)). Pursuant to Rule 12(b)(6), a court may dismiss a complaint that fails "to state a claim on which relief can be granted" due to either "the lack of a cognizable legal theory or the absence of sufficient facts alleged." *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (simplified).

## DISCUSSION

Plaintiff argues that there are several sources that create a duty that required Defendants to protect her from her father's abuse: (1) common law ordinary negligence; (2) special relationship or circumstances, including a statutory duty to report and negligent performance of an undertaking; and (3) a failure to warn. See PFAC 23–33. However, Plaintiff fails to allege facts sufficient to show Defendants owed Plaintiff a legal duty to protect her from abuse by her father that occurred outside of any church function or facility.

### Ordinary Negligence

In *Stone v. Witt*, the Oregon Supreme Court clarified how a plaintiff may successfully bring a negligence claim under Oregon law. 374 Or. 524 (2025). The Court explained that the "universe of negligence claims" falls into "two overarching categories: those in which liability for harm actually resulting from the defendant's conduct is based on the ordinary rule of negligence, and

those in which special circumstances either expand or limit the scope of liability for harm actually resulting from the defendant's conduct." *Id*. at 533 (citing *Fazzolari By & Through Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987)). *Stone* suggests one begin assessing a negligence claim by asking whether a plaintiff's claim alleges ordinary negligence or special liability. *Id*. at 356. This question, in large part, turns on whether a plaintiff alleges that the defendant's actions *created* a foreseeable risk to a protected interest of the kind that befell the plaintiff. *Fazzolari*, 303 Or. at 17. If so, then a plaintiff sufficiently pleads an ordinary negligence claim since "everyone owes each other the duty to act reasonably in light of foreseeable risks of harm[.]" *Id*. However, a negligence claim that alleges harm "resulting solely from a defendant's failure to act" must "allege facts sufficient to show the special circumstances that warrant liability[.]" *Stone*, 374 Or. at 357.

Plaintiff unconvincingly argues that Defendants' failure to act was in fact an affirmative action that *created* a foreseeable risk of *additional* sexual, verbal, mental, and emotional abuse. Resp. Defs.' Mot. 10, ECF No. 59. No reasonable factfinder could agree based on the alleged facts.

Specifically, Plaintiff points to her allegations that Wade Pickett, an agent for Defendants, "did not take action to report the abuse to civil authorities, investigate, intervene, convene a disciplinary council, or otherwise prevent or protect against any further child sexual abuse of Julie Doe by Craig Ford." PFAC ¶ 23. Wade Pickett "did not take action to help, support, offer services to, counsel or warn Plaintiff[.]" PFAC ¶ 23. And that, on information and belief, Pickett "discouraged Jennifer Ford from reporting the abuse to civil authorities" because he believed she lacked sufficient proof. PFAC ¶ 23. According to Plaintiff, these "acts created an additional risk for Plaintiff because it allowed Mr. Ford to further isolate Plaintiff by taking her to live with him alone in Oregon, unimpeded, where the sexual abuse escalated in frequency and invasiveness." Resp. Defs.' Mot. 24. Finally, Plaintiff asserts that "Defendants' continual downplaying of Craig

Ford's abuse as 'consensual' and not something worthy of reporting … created additional risks of harm to Plaintiff." *Id.* at 25.

No reasonable factfinder could conclude, based on these allegations, that Defendants *took actions* that *created* additional risk to Plaintiff. A defendant's "conduct creates a risk when the actor's conduct or course of conduct results in greater risk to another than the other would have faced absent the conduct." *Stone*, 374 Or. at 540 (citing *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* (2010)). Here, Plaintiff's allegations focus entirely on examples of the Defendants' inaction. And, as objectionable as this inaction might be, Defendants did not create the risk of harm that befell Plaintiff, and they had no duty under an ordinary negligence theory to protect her from her father's abuse that occurred in her home.

**Special Relationship or Circumstances**

Beyond the bounds of an ordinary negligence claim, "liability may still arise in special cases out of circumstances that create an obligation on the part of 'the negligent actor to the injured party[.]'" *Stone*, 374 Or. at 353 (quoting *Oregon Steel Mills, Inc. v. Coopers & Lybrand LLP*, 336 Or. 329, 341 (2004)). "Those special obligations can flow from sources of law like statutes or court orders, or they can arise because of an undertaking or a relationship between the plaintiff and defendant for which the common law recognizes a special obligation." *Id*. at 353–356.

Because Plaintiff does not allege facts sufficient for an ordinary negligence claim, she must allege the existence of a special relationship or special circumstances that imposed a duty on Defendants. *Stone*, 374 Or. at 537 ("[A] negligence claim alleging solely economic or emotional harm, or harm resulting solely from a defendant's failure to act, must allege facts sufficient to show the special circumstances that warrant liability, because negligence liability ordinarily does not extend to those categories of harm."). She unsuccessfully alleges the presence of either source.

**A. Special Relationship**

Plaintiff alleges that through her "membership and participation in the LDS Church," Defendants entered a special relationship with her. PFAC ¶ 17. This special relationship, according to Plaintiff, results in Defendants owing her "a special duty of care in addition to a duty of ordinary care to protect her from harm." PFAC ¶ 43. But Plaintiff cannot cite any controlling precedent that states a church has a special relationship with its members when they are *outside* the scope of the church's supervisory control.

An allegation of church membership by itself does not create a special relationship. *See Risley v. The Church of Jesus Christ of Latter-day Saints*, 2026 WL 685971, at *6 (C. D. Cal. March 10, 2026) ("Churches do not have a special relationship with all the children in their congregations simply based on membership."). The existence of a special relationship fundamentally requires one party to have some manner of control over the other. *See Shin v. Sunriver Preparatory Sch., Inc.*, 199 Or. App. 352, 367 (Or. Ct. App. 2005) (quoting *Conway v. Pacific Univ.*, 324 Or. 231, 239–240 (1995) ("[B]ecause the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution."). It may likely be the case that Defendants and Plaintiff were engaged in a special relationship when she was present at church activities. But the relevant question here is whether the duty of that relationship extends to Plaintiff's present allegations.

While at times Plaintiff was under the supervision of Defendants, she does not allege that any of the abuse she suffered occurred during those times of supervision. Any special duty of care that existed when Plaintiff was under the control of Defendants ended when she returned to her father's custody. *See C.J.C. v. Corp. of Catholic Bishop of Yakima*, 985 P.2d 262, 274 (Wash. 1999); *see also F.T. v. West Linn-Wilsonville School Dist.*, 318 Or. App. 692 (2022); *see also Pratt*

*v. Robinson*, 349 N.E. 2d 849, 852 (N.Y. 1976) (finding that a special relationship with a school and student ends once "the child has passed out of the orbit of its authority" so that "the parent is … free to reassume control over the child's protection."). Because she does not allege that any abuse occurred while under the supervision of Defendants, Plaintiff's special relationship theory fails as a matter of law.

**B. Special Circumstances**

In the alternative, Plaintiff argues that "special circumstances existed between Plaintiff and Defendants from which Defendants owed Plaintiff a special duty of care." PFAC ¶ 42. Plaintiff lists several circumstances that give rise to a duty, including Defendants inviting Plaintiff to become a member of the LDS Church; Plaintiff frequently being in the custody of Defendants; Defendants' specialized knowledge about the problem of child sex abuse; Oregon's mandatory reporting statute; and more. See PFAC ¶ 42. Plaintiff unsuccessfully alleges the existence of duty arising from special circumstances. Most prominently, Plaintiff argues Defendants owed her special duties based on (a) statutory reporting obligations and (b) a voluntary undertaking.

**a. Statutory Duty**

Plaintiff asserts that a special duty of care arises from Oregon's mandatory reporting statute, O.R.S. § 419B.010. The statute requires public or private officials that have "reasonable cause to believe that any child with whom the official comes in contact has suffered abuse … immediately report or cause a report to be made[.]" O.R.S. § 419B.010. As *Stone* affirms, a duty "can flow from sources of law like statutes or court orders[.]" 581 P.3d at 536. Plaintiff alleges that Defendants' agents in Albany knew about the abuse and did not report it to authorities. PFAC ¶ 30. Notably, though, a private right of action does not exist in the statute. See O.R.S. § 419B.010; *E.J.T. v. Jefferson County*, 518 P.3d 568 (Or. 2022). And Plaintiff does not point to controlling

authority that convinces this Court that Oregon's reporting statutes alone are sufficient to manufacture a negligence claim under a special negligence theory. As a result, Plaintiff may not rely on Oregon's mandatory reporting statutes here to establish a common-law duty.

**b. Negligent Performance of an Undertaking**

Plaintiff next advances a voluntary-undertaking theory premised on the Church's internal policies regarding preventing and responding to abuse. Because Plaintiff fails to allege how Defendants took steps to specifically rescue *her* in a manner that increased her harm, Plaintiff's final theory is unsuccessful as well.

When a good Samaritan without a duty to save undertakes a rescue of a person in peril, they assume a duty and become "subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking" if "(a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts § 323; *Arney v. Baird*, 661 P.2d 1364, 1366 (Or. Ct. App. 1983).

The LDS Church maintains internal policies that guide its response to learned instances of abuse within its membership. PFAC 9. The policies include encouraging Church leaders to: take disclosures of abuse seriously; report abuse to civil authorities; aid and protect vulnerable survivors of abuse from future harm; and provide spiritual counseling and support to help victims overcome the effects of abuse. PFAC 9. The guidance underscores that a "church leader's duty to protect others is more important than the duty of confidentiality, and church leaders should contact civil authorities immediately when it is necessary to prevent serious injury even if doing so might violate their duty of confidentiality." PFAC 9. By having these policies, Plaintiff argues Defendants voluntarily undertook to save and protect *her* from her father's abuse, resulting in the

creation of a duty and subjecting Defendants to liability. PFAC 35–36.

Plaintiff alleges she suffered additional sexual abuse and physiological harm *because* Defendants failed to exercise reasonable care in executing (or, rather, not executing) their policy-induced undertaking. PFAC 35–36. In the alternative, Plaintiff alleges she suffered harm by relying on Defendants to reasonably implement their policies. PFAC 35.

In support of her theory, Plaintiff relies on *Lewis v. Bellows Falls Congregation of Jehovah's Witnesses*, 248 F. Supp. 3d 530 (D. Vt. 2017). Resp. Defs.' Mot. 12. In *Lewis*, though, the court found that a factfinder could "reasonably conclude the [defendant], at least, had undertaken [a duty to monitor based on internal policies and procedures]." *Id*. at 539. Here, however, Plaintiff fails to allege facts demonstrating that Defendants took any meaningful steps to rescue her from her father.

As previously noted, Plaintiff alleges inaction by Defendants in response to learning about her abuse. No reasonable factfinder would find that Defendants took steps to undertake the tasks identified in their generalized policies on sexual abuse. Generalized policies, without more, are not voluntary undertakings. *See Doe 2*, 805 S.E. 2d at 583 ("any violation of an internal policy does not give rise to the voluntary assumption of a duty and does not establish that [defendant] owed a duty of care as a matter of law.); *see also Doe v. United States Youth Soccer Ass'n Inc.*, 8 Cal. App. 5th 1118, 1139 n.7 (2017). While Defendants' policies ring disappointingly hollow, Plaintiff does not allege sufficient facts to advance her voluntary undertaking claim.

Public policy weighs heavily against Plaintiff's undertaking theory. If Plaintiff's claim was permitted to advance, any well-intentioned entity with generalized policies aimed at preventing and responding to sexual abuse could be subject to liability for harm caused outside their supervisory control. Plaintiff's preferred understanding of negligence law would likely discourage

such entities from developing or maintaining any sexual abuse-related policies at all. This Court is not willing at this time to test such a prediction.

**Failure to Warn**

Finally, Plaintiff asserts that because Defendants had specialized knowledge of the abuse and its severe, foreseeable consequences, they had a duty to warn Plaintiff of long-term emotional and psychological injuries resulting from continued abuse. PFAC ¶ 58–60. According to Plaintiff, if Defendants had intervened, she would have "taken steps to end or escape the abuse sooner." PFAC ¶ 65. This theory of duty is unavailing as well.

In Oregon, a defendant a may be liable under a failure to warn theory "if the defendant can reasonably foresee that there is an unreasonable risk of harm, a reasonable person in the defendant's position would warn of the risk, the defendant has a reasonable chance to warn of the risk, the defendant does not warn of the risk, and the plaintiff is injured as a result of the failure to warn." *Fuhrer v. Gearhart-By-The-Sea, Inc.*, 760 P.2d 874, 878 (Or. 1988) (en banc). A court considers four factors to determine "whether action or a failure to act is reasonable: the likelihood of harm, the severity of the possible harm, the 'cost' of action that would prevent the harm, and the defendant's position, including the defendant's relationship with the plaintiff." *Id*. at 878. "The risk in a failure-to-warn case is not the hazard itself, but the chance that someone predictably will be exposed to danger … if no warning is made." *Id*. at 438.

Importantly here, unlike in *Fuhrer*, a trier of fact could not reasonably find that a warning from Defendants would have prevented the harm. Plaintiff already knew of the harm (e.g., continued sexual abuse by her father) by the time Defendants learned about the abuse. Moreover, government authorities were already investigating the alleged abuse by the time Defendants first learned about it. See Oral Argument Tr. 7, ECF No.74. As previously discussed, Defendants did

not have a special relationship with Plaintiff that demands a higher expectation of conduct. It would be a step too far for this Court, in applying state law, to find that *any* person or entity who knows of ongoing abuse and takes no action is liable for negligence under a failure to warn theory. Plaintiff's final theory of negligence fails as a matter of law.

**CONCLUSION**

Because Plaintiff does not allege facts that could establish a legal duty, Defendants' Motion for Judgement on the Pleadings, ECF No. 56, is GRANTED.

IT IS SO ORDERED.

DATED this 8th day of September, 2026.

/s/Michael J. McShane
Michael J. McShane
United States District Judge